IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

MARIE MANZANARES EX REL
HER SON ZEKIEAL DIEGO
DEVARGAS,

        Plaintiff,

v.                                    Civ. No. 16-1070  KK

NANCY A. BERRYHILL,
Acting Commissioner of the
Social Security Administration,

        Defendant.


## MEMORANDUM OPINION AND ORDER[1]

     **THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 11-1)[2] filed February 10, 2017, in connection with the *Motion to Reverse and Remand for a Rehearing with Supporting Memorandum* filed April 24, 2017, by Plaintiff Marie Manzanares (Doc. 17.)  The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c).  Having meticulously reviewed the entire record and the applicable law and being fully advised in the premises, the Court finds that Plaintiff's motion is well taken and shall be **GRANTED**.

## I. Background and Procedural Record

     Plaintiff Marie Manzanares's son, Zekieal Devargas ("ZD"), was born in 2004 and was, therefore, at all relevant times a school-age child.  (Tr. 19.)  On July 11, 2012, Plaintiff protectively filed an application on ZD's behalf for supplemental security income (SSI) benefits

---

[1]  Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings, and to enter an order of judgment, in this case.  (Doc. 10.)

[2]  Hereinafter, the Court's citations to Administrative Record (Doc. 11-1), which is before the Court as a transcript of the administrative proceedings, are designated as "Tr."

under title XVI of the Social Security Act, 42 U.S.C. Section 1381 through 1381c, claiming that ZD was disabled as of February 24, 2011, at the age of six, because of attention deficit hyperactivity disorder (ADHD) and oppositional defiant disorder (ODD).[3]  (Tr. 57, 147, 175, 179.)  Plaintiff's application was denied at the initial level (Tr. 57-66), and at the reconsideration level (Tr. 67-76).  Upon Plaintiff's request, Administrative Law Judge (ALJ) Ann Farris held a hearing on January 27, 2015. (Tr. 16.)  Plaintiff and ZD appeared in person at the hearing with attorney representative Michael Armstrong.  (Tr. 33.)  ALJ Farris took testimony from ZD (Tr. 37-45), from Plaintiff (Tr. 45-51), and from ZD's grandmother, Sylvia Martinez (Tr. 51-54).  In a written decision issued on May 26, 2015, ALJ Farris found that ZD was not "disabled" as that term is defined in the Social Security Act.  (Tr. 13-28.)  On July 25, 2006, the Appeals Council denied Plaintiff's request for review, rendering ALJ Farris's May 26, 2015, decision the final decision of the Commissioner of the Social Security Administration (Defendant).  (Tr. 1-3.)  Plaintiff timely filed a complaint seeking judicial review of the Commissioner's final decision. (Doc. 1.)

On appeal, Plaintiff argues that ALJ Farris erred in two respects:  (1) by rejecting the medical opinion of treating psychiatrist William Johnson, M.D.; and (2) by failing to adequately address the medical assessment of State agency examining psychological consultant Robert Krueger, Ph.D.  (Doc. 17 at 1.)  Plaintiff argues these failures constituted harmful error because it led ALJ Farris to the erroneous conclusion that ZD's impairments were not functionally equivalent to an impairment listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P. which, in turn, led her to conclude that ZD was not disabled.  (Doc. 17 at 3, 24, 26.)

---

[3] The specific date of onset is not consistent within the record.  *See* Tr. 57 (alleged onset date of 2/24/2011); Tr. 67, 147 (alleged onset date of 4/15/2011).

## II. Applicable Law

### A. Standard of Review

The Court reviews the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). A decision is based on substantial evidence where it is supported by "relevant evidence [that] a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118. A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley,* 373 F.3d at 1118, or if it "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Therefore, although an ALJ is not required to discuss every piece of evidence, "the record must demonstrate that the ALJ considered all of the evidence," and "the [ALJ's] reasons for finding a claimant not disabled" must be "articulated with sufficient particularity." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). Further, the decision must "provide this court with a sufficient basis to determine that appropriate legal principles have been followed." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005). In undertaking its review, the Court may not "reweigh the evidence" or substitute its judgment for that of the agency. *Langley*, 373 F.3d at 1118.

### B. Standards Governing Childhood Disability Determination

A child under the age of eighteen is considered "disabled" if he "has a medically determinable . . . mental impairment, which results in marked and severe functional limitations, and which . . . has lasted or can be expected to last for a continuous period of not less than

12 months." 42 U.S.C. § 1382c(C)(i). The Social Security Administration follows a three-step inquiry to determine whether a child is disabled. 20 C.F.R. § 416.924(a).

At step one, the ALJ must determine whether the child is doing "substantial gainful activity." 20 C.F.R. § 416.924(b). If the child is not doing substantial gainful activity, the ALJ proceeds to step two. *Id.* At step two, the ALJ must determine whether the child has one or more "severe" "medically determinable impairment(s)." 20 C.F.R. § 416.924(a), (c). If so, the ALJ proceeds to the next step. *Id.* At step three, the ALJ must determine whether the child's impairments meet, medically equal, or *functionally equal*[4] the Listings of Impairments contained in 20 C.F.R pt. 404, subpt. P., App. 1. 20 C.F.R. § 416.924(d); *Knight ex rel. P.K. v. Colvin*, 756 F.3d 1171, 1175 (10th Cir. 2014.).

To "functionally equal" a listed impairment, the child must have an impairment that results in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a). The relevant domains of functioning are: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for yourself, and (6) health and physical well-being. 20 C.F.R. § 416.926a(b). In examining functional equivalence, the ALJ must "assess the interactive and cumulative effects of all of the [child's] impairments" including those that are not "severe" to determine how the impairments affect the child's activities—meaning everything he does at home, at school, and in the community. 20 C.F.R. § 416.926a(a), (b). The ALJ must consider how appropriately, effectively, and independently the child performs his activities as compared with children of the same age who do not have impairments. 20 C.F.R. § 416.926a(b).

---

[4] The issues raised in this case arise from ALJ Farris's determination that ZD's impairments did not "functionally equal" a listed impairment. (Doc. 17 at 24, 26.)

Two domains of functioning are relevant to the Court's analysis: acquiring and using information, and attending and completing tasks. "Acquiring and using information" pertains to how well the claimant is able to "acquire or learn information, and how well [he uses] the information [he has] learned." 20 C.F.R. § 416.926a(g). School age children, such as ZD, "should be able to learn to read, write, and do math, and discuss history and science." 20 C.F.R. § 416.926a(g)(2)(iv). They should also "be able to use increasingly complex language (vocabulary and grammar) to share information and ideas with individuals or groups, by asking questions and expressing [their] own ideas, and by understanding and responding to the opinions of others." *Id.*

"Attending and completing tasks" pertains to how well the claimant is "able to focus and maintain [his] attention, how well [he] begin[s], carr[ies] through, and finish[es] [his] activities, including the pace at which [he] perform[s] activities and the ease with which [he] change[s] them." 20 C.F.R. § 416.926a(h). A child in ZD's age group "should be able to focus [his] attention in a variety of situations in order to follow directions, remember and organize [his] school materials, and complete classroom and homework assignments." 20 C.F.R. § 416.926a(h)(2)(iv). He "should be able to concentrate on details and not make careless mistakes in [his] work (beyond what would be expected in other children [of the same] age who do not have impairments)." *Id.* He "should be able to change [his] activities or routines without distracting [himself] or others, and stay on task and in place when appropriate." *Id.* He "should be able to sustain [his] attention well enough to participate in group sports, read by [himself], and complete family chores." *Id.* And he should "be able to complete a transition task (e.g. be ready for the school bus, change clothes after gym, change classrooms) without extra reminders and accommodation." *Id.*

An ALJ should find that a child has a "marked" limitation in one of these domains if his impairment: "[i]nterferes seriously with [his] ability to initiate, sustain, or complete activities" regardless of whether the impairment limits only one activity or whether the interactive and cumulative effects of the child's impairments limit several activities. 20 C.F.R. § 416.926a(e)(2)(i). A "marked" limitation is one that is "more than moderate, but less than extreme"; and "is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two . . . standard deviations below the mean." *Id.* An ALJ must find that a child has a marked limitation if, on a standardized test designed to measure ability or functioning in a particular domain, the child's score is two standard deviations below the mean and that score is consistent with his daily functioning in the relevant domain. 20 C.F.R. § 416.926a(e)(2)(iii).

An ALJ should find that a child has an "extreme" limitation in a particular domain when his impairment interferes "very seriously" with his "ability to independently initiate, sustain, or complete activities" regardless of whether the impairment limits only one activity or whether the interactive and cumulative effects of the child's impairments limit several activities. 20 C.F.R. § 416.926a(e)(3)(i). A limitation is extreme if it is "more than marked"; and, though it is reserved for the "worst limitations[,]" it "does not necessarily mean a total lack or loss of ability to function." *Id.* An ALJ must find that a child has an extreme limitation if, on a standardized test designed to measure ability or functioning in a particular domain, the child's score is three standard deviations below average and that score is consistent with his daily functioning in the relevant domain. 20 C.F.R. § 416.926a(e)(3)(iii).

As stated in the regulations defining the terms "marked" and "extreme," standardized test scores are a factor that an ALJ may consider in determining a child's limitations in the relevant

domains of functioning. However, "[n]o single piece of information taken in isolation can establish whether" the child's limitations in a particular domain are marked or extreme. 20 C.F.R. § 416.926a(e)(4)(i). Thus, the ALJ may not rely on any test score alone. *Id.* Instead, the ALJ should consider the child's test scores together with other information about his functioning, including "reports of classroom performance and the observations of school personnel and others." 20 C.F.R. § 416.926a(e)(4)(ii). As an example, a child may have IQ scores that are higher than two or three standard deviations below average, but if other evidence in the record shows that an impairment causes him to function in school, at home, and in the community far below his expected level of functioning, his impairment may be "marked" or "extreme" despite his IQ score. 20 C.F.R. § 416.926a(e)(4)(ii)(A). Further, as a general rule, the ALJ should not rely on a test score as a measurement of the child's functioning within a domain when the record contains other information about the child's functioning that is typically used by medical professionals to measure day-to-day functioning. 20 C.F.R. § 416.926a(e)(4)(iii)(B).

### III. Analysis

As noted above, the Social Security Administration follows a three-step inquiry to determine whether a child is disabled. 20 C.F.R. § 416.924(a). ALJ Farris's analysis of the first two steps is not at issue here. ZD, who was ten years old when ALJ Farris issued her decision, was not involved in "substantial gainful activity." (Tr. 19.) And ZD's impairments—ADHD, conduct disorder, and ODD were shown by "longitudinal evidence" to "impose more than minimal limitations on [his] ability to function at home and [at] school," and were accordingly "severe." (Tr. 19.) The parties' arguments and the Court's discussion are centered, instead, on the third step.

At the third step of the analysis, ALJ Farris found that ZD had a "marked" limitation in the domain of interacting and relating with others, and "less than marked" or "no limitation" in the other domains of functioning. (Tr. 23-28.) Accordingly, ALJ Farris concluded that ZD does not have an impairment or combination of impairments that functionally equals the severity of the listings. (Tr. 19.) *See* 20 C.F.R. § 416.926a(a) (stating that a child must have an impairment that results in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain to be considered disabled under the functional equivalence standard). It is this conclusion, and the reasons that ALJ Farris gave in support thereof, that give rise to the issues on appeal. (Doc. 17 at 17-26.)

Plaintiff argues that ALJ Farris failed to abide by the appropriate legal standards— namely the "treating physician rule," because her decision failed to address significant portions of the record that supported the opinions of ZD's treating physician, Dr. Johnson, and failed to articulate legitimate reasons for rejecting his opinions. (Doc. 17 at 19-26.) Plaintiff also argues that ALJ Farris failed to properly address the opinions of the State agency consultative evaluating psychologist. (Tr. 17 at 22-26.)

The Court finds that ALJ Farris's decision does not reflect the she applied the correct legal standards—particularly the "treating physician rule," nor does it adequately reflect that ALJ Farris considered all of the relevant evidence in reaching her determination that ZD is not disabled. For these reasons, as explained more fully below, the Court shall grant Plaintiff's *Motion*.

A.   **Treating Physician**

ZD began treatment at Zia Behavioral Health with Dr. Christopher Clancy in February 2011, when he was six years old. (Tr. 384.) In February 2012, ZD's care was transferred to

Dr. William Johnson, who treated ZD for approximately three years. (Tr. 413-40, 443-45, 448-53, 458-59, 463-65, 468-70, 482-84, 491-93.)

Dr. Johnson's treatment notes consistently document ZD's issues at home and at school. For example, in their first visit, on February 3, 2012, Dr. Johnson noted that ZD was hyperactive (trouble sitting, constantly on the go, disruptive and fidgeting); impulsive (blurts out, interrupts, easily frustrated, hits, kicks, pushes, slams doors, acts on impulse, and always has to be first); inattentive (easily bored, easily distracted, starts but does not complete tasks, rushes through tasks, makes careless mistakes, requires frequent reminders and short directions, and is disorganized). (Tr. 413.) Dr. Johnson noted that at school, ZD was disruptive, had to change classes, and had to be placed at his own table; he engaged in bullying and lying; he was oppositional and defiant, often laughing at his mother and refusing to listen to her. (*Id.*) Dr. Johnson further noted that ZD had been kicked off the bus, and kicked out of boys and girls club because of his behaviors, and that consequences were ineffective. (*Id.*) In monthly treatment notes from April through December 2012, Dr. Johnson indicated that, at times, ZD's attention and thought processes improved on medication, but he was still having temper fits, was getting in trouble at school at recess and in the classroom, and had frequent conflicts at home—particularly with his brother, which included fighting, hitting, and breaking and throwing things. (Tr. 338-50, 417, 420, 423.) Dr. Johnson's treatment notes from January through April 2013, November and December of 2013, and from March, April, June, and July of 2014, similarly reflect ZD's continuous difficulties at home and at school, and continuous issues with attention and concentration. (Tr. 351-67, 443-45, 448-53, 458-59, 463-65, 468-70, 482-84, 491-93.)

Dr. Johnson's treatment notes also reflect a decline over time in ZD's overall functioning, as indicated by his assessment of ZD's global assessment of functioning (GAF) scores.[5] Specifically, when ZD began treating with Dr. Johnson in February 2012, Dr. Johnson assessed a GAF score of 50.[6] (Tr. 415.) This score remained consistent through May 2013. (Tr. 339, 342, 347, 349, 353, 357, 361, 366, 371, 418, 421, 424). In September 2013, however, Dr. Johnson assessed a GAF score of 45. (Tr. 437.) And, in January 2014, Dr. Johnson assessed a GAF score of 40[7]. (Tr. 437.) Dr. Johnson's assessment did not change thereafter, and, as of July 2014, Dr. Johnson's treatment notes reflect that ZD's GAF score remained at 40. (Tr. 460, 465, 470, 484, 493.)

On January 19, 2015, Dr. Johnson completed a "Domains of Functioning" form on ZD's behalf.[8] (Tr. 535-36.) The form calls for an assessment of the degree to which ZD's medical impairments affect his development and performance of age-appropriate activities in six "domains of functioning." (Tr. 535.) In making this assessment, Dr. Johnson was required to compare ZD "with children the same age who do not have impairments nor are in special education classes." (*Id.*) Dr. Johnson opined, in relevant part, that ZD had "marked" limitations

---

[5] *See Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders*, 32, 34 (4th ed. 2000) (explaining that a GAF score is a subjective rating on a one hundred point scale, divided into ten numerical ranges, which permits clinicians to assign a single ranged score to a person's psychological, social, and occupational functioning).

[6] A GAF score of 41-50 indicates serious symptoms (*e.g.,* suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.,* no friends, unable to keep a job). *Id.* at 34.

[7] A GAF score of 31-40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (*e.g.,* depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). *Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders*, at 34.

[8] ZD's fourth-grade teacher also completed this form. (Tr. 531-32.) She opined that ZD had marked limitations in the domain of acquiring and using information; extreme limitations attending and completing tasks; moderate limitations interacting and relating with others; none to slight limitations moving about and manipulating objects; marked limitations in the domain of caring for yourself; and none to slight limitations in health and physical wellbeing. (*Id.*)

in two domains of functioning—(1) acquiring and using information, and (2) attending and completing tasks. (Tr. 535.) This is significant because, as noted earlier, a child who has marked limitations in two domains of functioning is considered disabled as a matter of Social Security law. 20 C.F.R. § 416.926a(a). At the time Dr. Johnson completed this assessment, ZD had been his patient for approximately three years, and he had treated ZD in his office twenty-six times.

ALJ Farris gave "little weight" to Dr. Johnson's opinion, thereby essentially rejecting it. (Tr. 22.) *See Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012) (indicating that to accord "little weight to" a physician's opinion is tantamount to "effectively rejecting" it). As noted above, contrary to Dr. Johnson's opinion, ALJ Farris found that ZD had "less than marked" limitations in the "acquiring and using information" and "attending and completing tasks" domains of functioning. (Tr. 22-25.) ALJ Farris's discussion of Dr. Johnson's opinion was tied to her discussion of the opinion of ZD's fourth grade teacher, Ms. Hubley who, like Dr. Johnson, assessed ZD's "domains of functioning" on a standardized form. (Tr. 531.) Ms. Hubley's opinions accorded with those of Dr. Johnson with one relevant exception—whereas Dr. Johnson opined that ZD had "marked" limitations in the domain of attending and completing tasks, Ms. Hubley opined that ZD had "extreme" limitations in this domain. (Tr. 531, 535.)

Against this contextual backdrop, ALJ Farris explained:

As for the opinion evidence, the undersigned gives little weight to the two forms submitted after the hearing, purportedly from Dr. Johnson and Stephanie Hubley[.] . . . In Ms. Hubley's form it is stated that the child has marked limitations in the domain of acquiring and using information, and extreme limitations in attending and completing tasks, for instance. As the term "marked" is defined on the form itself as a function that falls between two and three standard deviations below the mean—equivalent, for instance, to an IQ score below 70 on the WISC-III if the relevant domain were measured solely by IQ— such judgment is highly inconsistent with the evidence, including Dr. Johnson's report from only November of last year that the child was on the Merit Roll from

his grades in Ms. Hubley's classes. Further, when his IQ was tested, at a consultative examination with [Dr.] Krueger . . . these were found to fall within the normal range, not even one standard deviation below the mean. Further, Dr. Krueger noted that the child's score of 87 on the Freedom From Distractibility Index contained within the tests would "suggest relatively mild problems with maintaining attention." Although such scores are now slightly more than two years old, and thus not entirely applicable to the child's current functional abilities, no allegations were made that his cognitive function has declined, and his ability to be on the honor roll without an IEP or formal special education services certainly suggests otherwise. As it is fundamentally inconsistent with the evidence, and indeed cites no evidence at all in support of its conclusions, Ms. Hubley's opinion is given little weight. Dr. Johnson's opinion . . . is given little weight for the same reason.

(Tr. 22) (internal citations to the record omitted).) Thus, ALJ Farris's decision to give "little weight" to Dr. Johnson's opinion was based on two pieces of evidence: Dr. Johnson's November 2014 "report" and ZD's IQ scores as provided in Dr. Krueger's evaluation.

Plaintiff argues that, in rejecting Dr. Johnson's opinion, ALJ Farris failed to abide by the appropriate legal standards—namely the "treating physician rule" because her decision failed to address significant portions of the record that supported Dr. Johnson's opinion, and failed to articulate legitimate reasons for rejecting it. (Doc. 17 at 19-26.) Defendant argues that ALJ Farris stated "good reasons," which are supported by the record, for her decision to reject Dr. Johnson's opinions. (Doc. 20 at 10-12.)

### 1. The "Treating Physician" Rule

"According to what has come to be known as the treating physician rule, the Commissioner will generally give more weight to medical opinions from treating sources than those from non-treating sources." *Langley*, 373 F.3d at 1119; *see* 20 C.F.R. § 404.927(c)(2)[9] ("Generally, we give more weight to medical opinions from your treating sources, since these

---

[9] For all claims filed on or *after* March 27, 2017, 20 C.F.R. § 404.927 was rescinded and replaced with 20 C.F.R. § 404.920c. 82 Fed. Reg. 5844, 5880. Further, the Social Security Administration rescinded SSR 96-2p effective March 27, 2017, to the extent it is inconsistent with or duplicative of final rules promulgated related to Giving Controlling Weight to Treating Source Medical Opinions found in 20 C.F.R. § 404.927. 82 Fed. Reg. 5844, 5845.

sources are likely to be the medical professionals most able to provide a detailed, longitudinal

picture of your medical impairment(s) and may bring a unique perspective to the medical

evidence that cannot be obtained from the objective medical findings alone or from reports of

individual examinations, such as consultative examinations or brief hospitalizations."); 20 C.F.R.

§ 416.927(c)(2) (same). Indeed, where the opinions of treating physicians are medically well-

supported and not inconsistent with substantial evidence in the record, they must be accorded

"controlling weight." 20 C.F.R. § 416.927(c)(2).

 If, on the other hand, the treating physician's opinion is *inconsistent* with the record or is

not supported by medical evidence, it is not given controlling weight. *See Watkins v. Barnhart*,

350 F.3d 1297, 1301 (10th Cir. 2003) ("[I]t is . . . error to give an opinion controlling weight

simply because it is the opinion of a treating source if it is not well-supported by medically

acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other

substantial evidence in the case record." (alteration omitted)). Instead, the opinion, which is

"still entitled to deference[,]" *Langley*, 373 F.3d at 1119, is weighed by means of the following

six factors:

> (1) the length of the treatment relationship and the frequency of examination; (2)
> the nature and extent of the treatment relationship, including the treatment
> provided and the kind of examination or testing performed; (3) the degree to
> which the physician's opinion is supported by relevant evidence; (4) consistency
> between the opinion and the record as a whole; (5) whether or not the physician is
> a specialist in the area upon which an opinion is rendered; (6) other factors
> brought to the ALJ's attention which tend to support or contradict the opinion.

20 C.F.R. § 416.927(c).

### 2.  ALJ Farris's Decision Does Not Demonstrate the Application of Appropriate Standards to Dr. Johnson's Opinions

 As an initial matter, the Court notes that ALJ Farris's decision to conflate Dr. Johnson's

opinion with that of Ms. Hubley is out of step with the governing regulations. The regulations

provide distinct standards applicable to the opinions of treating physicians versus the opinions of "other sources." A medically well-supported opinion provided by a treating physician that is consistent with substantial evidence in the record must be accorded "controlling weight." 20 C.F.R. § 416.927(c)(2). If the ALJ determines that such an opinion is not entitled to controlling weight, the determination must be explained in some degree of detail, guided by the factors listed in 20 C.F.R. § 416.927(c). On the other hand, the opinions of non-medical sources who have seen a claimant in their professional capacity should be weighed according to appropriate factors such as the nature and extent of the relationship, and the degree to which their opinions are consistent with other evidence, but they are never to be accorded "controlling weight." SSR 06-03p, 2006 WL 2329939, at *6. ALJ Farris's decision to inextricably tie her analysis of Ms. Hubley's opinion to that of Dr. Johnson was error. Whereas Ms. Hubley's opinion should have been evaluated in light of her experience as ZD's teacher throughout his entire fourth grade year, Dr. Johnson's opinion, insofar as it was not given controlling weight, should have been analyzed pursuant to the factors listed in 20 C.F.R. § 416.927(c). By summarily considering the respective opinions together, ALJ Farris gave no indication that she was guided by appropriate standards in rejecting them. *See Jensen*, 436 F.3d at1165 (holding that the ALJ's decision must "provide this court with a sufficient basis to determine that appropriate legal principles have been followed").

Relatedly, the Court agrees with Plaintiff's contention that ALJ Farris erred by failing to abide by the "treating physician rule." (Doc. 17 at 19-26.) As noted above, if an ALJ decides to accord less than controlling weight to a treating physician's opinion, she must weigh the opinion using the factors enumerated in 20 C.F.R. § 416.927(c). She must also "give good reasons in the notice of . . . decision for the weight" assigned to a treating physician's opinion by articulating,

with sufficient clarity and specificity to facilitate review, the reasons for the weight assignment. *Watkins*, 350 F.3d at 1300; *see* SSR 96-2p, 1996 WL 374188, at *5 ("[T]he notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.") While an ALJ is not required to mechanically apply, or expressly discuss, each factor enumerated in 20 C.F.R. § 416.927(c) before rejecting a treating physician's opinion, *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007), it is error to simply ignore them. *Andersen v. Astrue*, 319 F. App'x 712, 718 (10th Cir. 2009) ("Although the ALJ's decision need not include an *explicit discussion* of each factor, the record must reflect that the ALJ *considered* every factor in the weight calculation." (citation omitted)).

Of particular relevance here, there is no indication that ALJ Farris's decision to give "little weight" to Dr. Johnson's opinions was informed to any degree by the fact that Dr. Johnson was a specialist in the field of child psychiatry, or to the length of Dr. Johnson's treatment relationship with ZD. *See* 20 C.F.R. § 416.927(c)(2)(i)-(ii) (indicating that more weight is given to the opinion of a treating physician who has more knowledge about the claimant's impairments and who has seen the claimant "a number of times and long enough to have obtained a longitudinal picture of" his impairment); 20 C.F.R. § 416.927(c)(5) (stating that generally, more weight is given to the medical opinion of a specialist about issues related to his area of specialty). Further, while ALJ Farris reduced the weight of Dr. Johnson's opinion based on a single note from November 2014 indicating ZD had achieved placement on the "Merit Roll" in fourth grade, the ALJ's truncated analysis leaves the Court with no indication that she considered other of

Dr. Johnson's notes, which spanned three years and which consistently documented ZD's academic difficulties.

For example, Dr. Johnson's treatment note from November 2012 indicates that as a second grader ZD was reading at a first grade level. (Tr. 346.) In September 2013, Dr. Johnson's treatment notes indicate that ZD—then a third grader, was slow to do his homework, his attention was "variable and fidgety," and that his teacher had sent home a note regarding his fidgetiness, and that his GAF score was 45. (Tr. 435-37.) In October 2013, when ZD was in third grade, Dr. Johnson noted that ZD was getting in more trouble at school and that his condition was worsening. (Tr. 439.) At the end of ZD's third grade year, Dr. Johnson noted that ZD had F's on his report card, but would matriculate to fourth grade, notwithstanding. (Tr. 468) In January 2014, Dr. Johnson noted that ZD's GAF score was 40, that his condition was worsening—with behaviors that were "acutely worse" at home and at school, and that his attention was variable and fidgety. (Tr. 451-52.) In other treatment notes taken during ZD's fourth grade school year, Dr. Johnson noted that ZD had a tutor, and that Plaintiff hoped to get ZD on an individualized education plan (IEP), but the counselor kept postponing it,[10] and that ZD's teachers reported that he was distractible in the afternoons. (Tr. 427-34.)

Nor does ALJ Farris's decision reflect that she considered the extent to which Dr. Johnson's opinion accorded with the treatment records of ZD's non-medical service providers (including a counselor and a therapist) who regularly saw ZD during the relevant time frame. 20 C.F.R. § 416.927(c)(2)(4) (stating that consistency between the record as a whole and the treating physician's opinion is a reason to give the opinion "more weight"); *see* SSR 06-03p,

_____

[10] The Court notes that ALJ Farris misstates the record in regard to the postponement of the IEP—stating in regard to Plaintiff's credibility, that "Plaintiff "professed that she hoped to get" ZD on an IEP, but she "admit[ted] to his treating doctor that it was postponed due to her own procrastination, suggesting [that] she does not see the need for such a plan to be as great as she testified." (Tr. 20; see Tr. 431.)

2006 WL 2329939, at *2-5 (explaining that in evaluating a medical opinion, adjudicators are required to consider information from "other sources" such as counselors and therapists that tend to support a medical opinion). To that end, the Court notes that although ZD was on the "Merit Roll" in November 2014, his counselor, Laura Bailey noted, in December 2014, that he was one grade level behind in his reading. (Tr. 505.) In other notes taken throughout 2013-2014, ZD's counselors[11] indicated, among other things, that ZD needed continuous help learning to complete appropriate chores; that he breaks things when he is angry; he had a "meltdown" during a basketball game with his brother; he exhibited aggression at school and at home; he had low grades in school at times, and even when his grades were high (A's and B's) he was reading below grade level and was struggling with math; he required assistance developing school readiness skills; required redirection when he became distracted; and that he needed to work on ensuring that he completed the tasks that he started. (Tr. 446, 455, 461, 494, 500, 502-03, 505.) Session notes from ZD's therapist, Debra Thompson, who saw ZD ninety-five times between October 2011 through June 2013, similarly reflect, among other things, that ZD was "easily distractible," had a hard time focusing, had difficulty listening to his teachers, and that he acted out at school. (Tr. 289-93, 375-78.) ALJ Farris erred in failing to consider these aspects of the record in weighing Dr. Johnson's opinion. SSR 06-03p, 2006 WL 2329939, at *2-5.

Plaintiff reasons that, had ALJ Farris given controlling weight to Dr. Johnson's opinion that ZD had marked limitations in *either* the "acquiring and using information" *or* the "attending and completing tasks" domains of functioning that these limitations, combined with ALJ Farris's conclusion that ZD has marked limitations in the domain of interacting and relating with others, would have led to a conclusion that ZD is disabled. (Doc. 17 at 24.) Thus, Plaintiff argues, ALJ

---

[11] Ms. Bailey was employed by Agave Health Inc., as were other counselors—Brittany Koukol and Susan Shelley who treated ZD in this time frame.

Farris's decision to accord Dr. Johnson's opinions "little weight" without addressing the significant and probative evidence supporting those opinions was not harmless error. (*Id.*) Because the foregoing evidence of ZD's functioning is relevant to and probative of ZD's limitations in the two at-issue domains of functioning,[12] the Court agrees with Plaintiff, and concludes that the ALJ's failure to abide by the treating physician rule, among other applicable regulations, requires remand. *See Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004) (stating that an error is "harmless" if the court may "confidently say that no reasonable administrative factfinder, following the correct legal analysis, could have resolved the factual matter in any other way").

## B. ALJ Farris's Decision Does Not Demonstrate the Application of Appropriate Standards to State Agency Examining Consultative Psychological Consultant Dr. Robert Krueger

To assist with processing his disability claim, the Social Security Administration (Disability Determination Service) referred ZD to Dr. Robert Krueger for a psychological evaluation. (Tr. 295.) Dr. Krueger was asked for information regarding ZD's then-current cognitive/emotional/behavioral functioning. (*Id.*) Dr. Krueger completed his evaluation on October 25, 2012, when ZD was 8 years old. (*Id.*) Among other things, Dr. Krueger evaluated ZD by administering the WISC-III IQ test. (Doc. 297.) ZD's scores on the WISC-III test placed

---

[12] For instance, the domain of "acquiring and using information," in which Dr. Johnson opined that ZD has a "marked limitation" includes a child's ability to learn to read. 20 C.F.R. § 416.926a(g)(iv). Dr. Johnson's treatment notes and those of ZD's counselors are consistent in their documentation of ZD's below-grade-level reading ability, and his need of a tutor or an IEP. *See* SSR 09-2P, 2009 WL 396032, at *5 ("[I]nformation about supports children receive can be critical to determining the extent to which their impairments compromise their ability to independently initiate, sustain and complete activities."); 20 C.F.R. § 416.926a(b) (stating that a child's impairments are to be evaluated as compared with children of the same age who do not have impairments). Additionally, the "attending and completing tasks" domain, as to which Dr. Johnson found that ZD has "marked" limitations, pertains, in part, to how well the claimant is able to focus his attention, stay on task and in place, and complete family chores. 20 C.F.R. § 416.926a(h)(2)(iv). A review of Dr. Johnson's treatment notes and those of ZD's counselors and therapist consistently reflect ZD's limitations, and need for treatment and support in these aspects of functioning.

him within the low average to average ranges of functioning, leading Dr. Krueger to conclude

that ZD did not have a major cognitive disorder.  (Doc. 297-98.)  Dr. Krueger concluded further

that ZD has

> relatively mild functional impairment.  It appears that his problems with ADHD
> are being controlled to some extent with medication and behavior management
> techniques.  At the present time he can be expected to have mild impairment with
> understanding, remembering, and following simple instructions and perhaps
> moderate impairment with complex or detailed instructions. At the present time
> he can be expected to have moderate impairment with adjusting to changes in a
> school environment . . . and he can be expected to have moderate impairment in
> relationships with peers and teachers. . . .  Because of ADHD and impulsive
> behavior, [Claimant] can be expected to have moderate impairment with being
> aware of and reacting appropriately to dangers in a school or home environment.
> These are relatively long-term problems, which can be expected to persist for
> more than one year.

(Tr. 299.)

Plaintiff argues that ALJ Farris's decision did not properly address Dr. Krueger's

opinions.  (Doc. 17 at 24.)  Specifically, Plaintiff argues that, although ALJ Farris relied on

Dr. Krueger's evaluation of ZD's IQ, she failed to consider Dr. Krueger's opinions with regard

to ZD's "moderate" limitations in: understanding, remembering and following complex or

detailed instructions; maintaining pace and persistence in a school environment; adjusting to

changes in a school environment; peer and teacher relationships; and awareness of and

appropriate reactions to danger in a school or home environment.  (Doc. 17 at 22; Tr. 299.)

Additionally, she argues, ALJ Farris failed to discuss how these limitations would affect ZD's

functioning in the relevant domains—particularly the at-issue domains of "acquiring and using

information" and "attending and completing tasks."  (Doc. 17 at 25-26.)  Defendant argues that

this constituted harmless error.  (Doc. 20 at 13.)  Insofar as ALJ Farris's treatment of

Dr. Krueger's opinion was significant to her decision to accord Dr. Johnson's opinion "little

weight" the Court cannot conclude that the errors identified by Plaintiff were harmless.

While an ALJ may rely on an examiner's opinion, she must explain the weight she is giving to it. *Hamlin*, 365 F.3d at 1215. The ALJ's decision for according weight to medical opinions must be supported by substantial evidence. *Hackett v. Barnhart*, 395 F.3d 1168, 1174 (10th Cir. 2005). Here, a review of ALJ Farris's decision does not demonstrate that her decision to accord greater weight to Dr. Krueger's opinion is supported by substantial evidence.

ALJ Farris recognized that Dr. Krueger's evaluation of ZD, having been conducted more than two years prior to the hearing was "not entirely applicable to [Claimant's] current functional abilities" (Tr. 22.) Nevertheless, she appears to have ascribed more weight to it than to Dr. Johnson's then-current opinions. In support of this decision, ALJ Farris cited the absence of "allegations . . . that [Claimant's] cognitive function ha[d] declined." (Tr. 22.) This reasoning suggests ALJ Farris's failure to consider Dr. Johnson's treatment notes which, among other things, documented a decline in ZD's functioning (as reflected by his GAF score) in September 2013—approximately one year after Dr. Krueger's evaluation, and a further decline by January 2014—approximately fifteen months after Dr. Krueger's evaluation. *See Jaramillo v. Colvin*, 576 Fed. App'x 870, 874 (10th Cir. 2014) (noting that evidence of a more recent physician's opinion, which contradicted a medical opinion formed two years earlier was "significant" to the extent that it reflected that the ALJ considered only portions of the evidence favorable to its determination); *see Langley*, 373 F.3d at 1118 (stating that a decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record"). Furthermore, although she relied primarily on ZD's IQ scores as a basis for rejecting Dr. Johnson's opinions, ALJ Farris does not appear to have considered the consistency between ZD's IQ scores and substantial evidence of ZD's functioning in school, at home, or in the community, including Ms. Hubley's opinions, Dr. Johnson's treatment notes, and the treatment notes of made by ZD's counselors and

therapist. By relying on Dr. Krueger's evaluation of ZD's IQ, without also considering other relevant evidence in the record, ALJ Farris did not comply with the governing regulations. *See* 20 C.F.R. § 416.926a(e)(4)(iii)(B); *see also* 20 C.F.R. § 416.926a(e)(2)(iii) (requiring consideration of the consistency between test scores and the child's daily functioning in the relevant domain); 20 C.F.R. § 416.926a(e)(4)(ii) (requiring the ALJ to consider test scores in conjunction with "reports of classroom performance and the observations of school personnel"); 20 C.F.R. § 416.926a(e)(4)(iii)(B) (stating that the ALJ should not rely on a test score as a measurement of the child's functioning within a domain when the record contains other information about the child's functioning that is typically used by medical professionals to measure day-to-day functioning); 20 C.F.R. § 416.926a(e)(4)(ii)(A) (indicating that notwithstanding an IQ score suggesting a lack of impaired functioning, "marked" or "extreme" limitations  may be found based upon a claimant's functioning at home, at school, and in the community).

In summary, ALJ Farris's decision does not demonstrate that she applied the correct legal standards or that she considered all of the relevant evidence in determining that ZD is not disabled. *See* 42 U.S.C. § 405(g); *Clifton*, 79 F.3d at 1009 ("The record must demonstrate that the ALJ considered all of the evidence[.]"); *Langley*, 373 F.3d at 1118 (stating that the Court must determine whether the correct legal standards were applied).   Accordingly, this matter is remanded for a decision that provides the Court "with a sufficient basis to determine that appropriate legal principles have been followed." *Jensen*, 436 F.3d at 1165.

## IV.  <u>Conclusion</u>

For the reasons stated herein, Plaintiff's *Motion to Reverse and Remand for a Rehearing with Supporting Memorandum* (Doc.  17) is **GRANTED**.

**KIRTAN KHALSA**
**United States Magistrate Judge,**
**Presiding by Consent**